NATIONAL BANCSHARES CORPORA-
TION of Texas, et al., Appellants,

v.

Bob BULLOCK, Comptroller of Public
Accounts of the State of Texas, et
al., Appellees.

No. 12750.

Court of Civil Appeals of Texas,
Austin.

July 12, 1978.

Rehearing Denied Aug. 9, 1978.

Harry M. Reasoner, Vinson & Elkins, Houston, and C. W. Wellen, Fulbright & Jaworski, Houston, for appellants Bank Holding Companies.

Willis Witt, Liddell, Sapp, Zivley & Brown, Houston, for appellant Reidy International, Inc.

John L. Hill, Atty. Gen., Gilbert J. Bernal, Jr., Asst. Atty. Gen., Austin, for appellees.

O'QUINN, Justice.

Eight bank holding companies brought this lawsuit in September of 1974 to recover in excess of $2,000,000.00 in franchise taxes paid under protest to the Comptroller of Public Accounts. Subsequently, in January of 1976, one additional bank holding company intervened, and in March of 1976 an ordinary business corporation, holder of certificates of deposit of national banking associations situated in Texas, also intervened to be allied with plaintiffs. In addition to the Comptroller, the Attorney General and the State Treasurer were made parties defendant as required by statute.

The principal issue to be decided is whether the State may treat dividends and

interest flowing from a stock held in national banks as part of the holding corporation's "gross receipts from business done in Texas" for purposes of ascertaining the franchise tax. Challenged by plaintiffs below, who are appellants, and to be tested for validity, is Comptroller's Ruling 80–0.18 (1974), which on its face claims authority for such treatment under provisions of revised 12 U.S.C. Sec. 548 (1969, effective 1973), also known as Public Law 91–156. This suit also involves interpretation of an amendment, codified under Article 20.02, V.A.C.S., Taxation-General (1971), by which Act the Legislature of Texas undertook to control the effects of the federal statute (12 U.S.C. Sec. 548) on the Texas tax system.

To place the main issue of this cause in proper focus, it is appropriate to review the statutory, administrative, and case law developments established prior to the Comptroller's Ruling of 1974, which rested upon the Act of Congress, and together spawned the controversy leading to this litigation.

Every domestic and foreign corporation, chartered or authorized to do business in Texas or doing business in Texas, must pay a Texas franchise tax pursuant to requirements of Article 12.01, V.A.T.S., Tax.-Gen. Each corporation liable for payment of a franchise tax must determine, in compliance with Article 12.02(1)(a), ". . . the portion of its entire taxable capital taxable by the State of Texas by multiplying same by an allocation percentage which shall be the percentage relationship which *the gross receipts from its business done in Texas* bear to the total gross receipts of the corporation from its entire business." (Emphasis added)

The same basic franchise tax allocation formula in Article 12.02 was used in Article 7084, V.A.T.S., the source of the present statute. Article 7084 did not designate the receipts which were to be included as the corporation's "business done in Texas," and to supply certainty, in curing the omission, administrators of the Texas franchise tax adopted the "location of payor test" in allocating receipts from intangibles to a corporation's "business done in Texas." Only receipts from intangibles paid by a payor located in Texas were considered under this test to be a part of the corporate taxpayer's business done in Texas.

Thus receipts from intangibles paid to a corporation by an out-of-state payor were not treated as within the meaning of "business done in Texas" and were not included in applying the formula. Although it was recognized by the Supreme Court of Texas that such administrative policy was not obligatory, the Court nevertheless in 1967 held that the doctrine was of such long standing it should not be changed or departed from "in the absence of clear statutory authorization." *Humble Oil & Refining Co. v. Calbert*, 414 S.W.2d 172, 180 (Tex.Sup.1967).

A large portion of the gross receipts from business activities of the taxpayers in this lawsuit consists of dividends and interest received from national banks in which the several taxpayers own stock. National banks are not Texas corporations but are created under the National Bank Act (12 U.S.C. Sec. 21 et seq.) which constitutes ". . . by itself a complete system for the establishment and government of national banks." *Deitrick v. Greaney*, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940).

Prior to the dispute in this lawsuit, the Comptroller excluded dividends and interest, flowing from stock held in national banks, from a taxpayer's "gross receipts from its business done in Texas." In this case the Comptroller insists that even prior to this controversy the Comptroller could have treated national banks as domestic corporations if the Comptroller had chosen to do so. In apparent support of this contention, the Comptroller makes the singular argument that heretofore there was some "doubt" respecting the "domicile" of a national bank, and claims that the Comptroller resolved any doubt regarding the location of the payor national bank in favor of a status as a non-Texas corporation.

The provision of 12 U.S.C. Sec. 548 (P.L. 91–156), enacted by Congress in 1969 and effective in 1973, upon which the Comptroller rests the Ruling of 1974, is in this language:

"For the purpose of *any tax law enacted under authority of* the United States *or any State*, a national bank shall be treated as a bank organized and existing under the laws of the State or other jurisdiction within which its principal office is located." (Emphasis added)

The Comptroller contends that any doubt regarding location of payor which the Comptroller entertained prior to 1973 was removed automatically by the Congressional Act because "An ancillary effect of the statute was to eliminate prior uncertainties as to the domicile of national banks."

Prior to its amendment by the 91st Congress in 1969, 12 U.S.C. Sec. 548 provided a list of taxes which could be imposed on national banks by state legislatures. The permissible levies named were the only taxes which could be imposed by a state on any national bank. The statute was designed explicitly to restrict the power of state legislatures in levy of taxes on national banks. See 2 U.S.Code Cong. & Admin.News (1969), p. 1594.

The restrictions imposed under 12 U.S.C. Sec. 548 prior to amendment were not applicable of course to state taxation of state banks and thereby created an inequality between state and national banks. As early as 1943, the Legislature of Texas moved to remedy this inequality with enactment of Article 342–908, V.A.T.S., by which Texas voluntarily restricted its authority to tax state banks except in the same manner it imposed taxes on national banks.

The language of the statute, amended in 1963 and again in 1965, embodies the basic purpose and effect of the law as originally passed in 1943:

"State and national banks are hereby declared to be within the *same class* under the Constitution and laws of this state. *It is not the intention of the Legislature to discriminate between state banks, national banks, and private banks.* To the extent that the State of Texas has power to legislate with reference to national banks, all laws of this state shall apply alike to state banks, private banks, *and national banks domiciled in this state* ; and state banks and private banks shall be subject to only such taxes heretofore or hereafter imposed by the state, or any political subdivision thereof, as could lawfully be imposed upon such state banks or private banks were they operating as national banks." (Emphasis added)

Revised 12 U.S.C. Sec. 548, although enacted by Congress in 1969, was not made effective until 1973. In that interim the Legislature of Texas reacted to revision of the federal statute by enacting, among various amendments of tax statutes, Article 7 of that Act, which expressly foreclosed "any additional tax or taxes upon the institutions affected thereby" Public Law 91–156 (12 U.S.C. Sec. 548).

Article 7 in its full text provided:

"Section 1. The passage of Public Law 91–156 by the Congress of the United States shall not operate to impose or permit the imposition of any additional tax or taxes upon the institutions affected thereby unless:

(a) The tax or taxes were being imposed prior to January 1, 1971, or

(b) Such institutions are specifically designated as being subject to such additional tax or taxes other than the limited sales and use tax by an Act of the Legislature passed subsequent to the effective date of Public Law 91–156." (Acts 1971, 62nd Leg., p. 1193, 1206, ch. 292, Art. 7, eff. July 1, 1971; see also Note V.A.T.S. Tax.-Gen., art. 20.02).

Nearly three years later, the Comptroller, in April of 1974, published Ruling 80–0.18, the essential parts of which are set out:

"*General* : The 'location of payor' test is used in determining whether dividends and interest are attributable as receipts from business done in Texas under Article 12.02(1)(b). In accordance therewith, dividends and interest paid by a domestic corporation are includable in gross receipts from business done in Texas, whereas dividends and interest paid by a foreign corporation do not constitute Texas gross receipts under the statute.

"*State Banks*: Dividends and interest paid by a bank organized under the Banking Code of Texas are includable in gross receipts from business done in Texas pursuant to Article 12.02(1)(b).

"*National Banks*: Prior to January 1, 1973, national banks were considered to be foreign corporations for franchise tax purposes and, consequently, dividends and interest paid by a national bank located in Texas were not attributable as Texas gross receipts. Public Law 91–156 amended Section 5219 of the Revised Statutes to provide, effective January 1, 1973, that for the purposes of any tax law enacted under the authority of any state a national bank shall be treated as a bank organized and existing under the laws of the state within which its principal office is located. Accordingly, dividends and interest paid on and after January 1, 1973 by a national bank whose principal office is located within Texas are includable in gross receipts from business done in Texas pursuant to Article 12.02(1)(b)."

In reliance on the Ruling of 1974, the Comptroller assessed additional franchise taxes against appellant taxpayers in the amount of $1,022,803.77 for 1974 and $1,087,731.43 for 1975. Appellants paid the taxes for 1974 under protest and within ninety days thereafter brought this action for refund, and again in 1975 the taxes were paid under protest and appellants amended their pleadings to include the taxes paid for both 1974 and 1975.

The cause was tried before the court without a jury, and the court entered judgment on June 27, 1977, that plaintiffs below take nothing by their suit. The district court's judgment was based on the court's conclusion that as a matter of law appellants were not "institutions affected by the passage of Public Law 91–156 within the meaning of" Article 7 of the Legislative Act of 1971 (Note, Article 20.02, V.A.T.S., Tax.-Gen.).

We will reverse the judgment of the trial court and will render judgment that appellant taxpayers recover the taxes assessed pursuant to Ruling 80–0.18 and paid under protest.

In addition to the conclusion of law already noted, the trial court found the following facts:

(1) Franchise Tax Ruling 80–0.18, which held that dividends and interest from national banks with principal offices in Texas were "gross receipts from its business done in Texas," was promulgated as a *direct result* of the enactment of Public Law 91–156.

(2) The publication of Ruling 80–0.18 was the first formal pronouncement of the Comptroller's policy with respect *to the effect of Public Law 91–156 on the Texas franchise tax* treatment of dividends and interest from national banks.

(3) Acts 1971, 62nd Legislature, p. 1206, ch. 292, art. 7, Sec. 1, codified as a footnote to Article 20.02, V.A.T.S., Tax.-Gen., was adopted by the Legislature in 1971.

(4) The rule set forth in Ruling 80–0.18 increased the amount of franchise taxes payable by the taxpayers.

(5) Such increase was not being imposed prior to 1971.

(6) The taxpayers in this suit have not been specifically designated as being subject to such increase by any act of the Legislature passed after the effective date of 12 U.S.C. Sec. 548.

(7) Prior to the effective date of revised 12 U.S.C. Sec. 548, corporations receiving interest or dividends from Texas national banks were not required to include the same in their "gross receipts from its business done in Texas" for franchise tax purposes.

Appellants bring two points of error. *First*, appellants contend the trial court erred in concluding that the taxpayers are not "institutions affected" by passage of Public Law 91–156 and therefore not entitled to relief or protection purportedly provided by Article 7 of the Legislative Act of 1971, now annotated as a footnote to Article 20.02, V.A.T.S., Tax.-Gen. *Second*, appellants urge error because the trial court concluded that Public Law 91–156 automatically imposed, or permitted, without State

legislation, an additional tax on appellants. In essence this claim is that revision of 12 U.S.C. Sec. 548 dealt with equal taxation of state and national banks, and that since the revised statute was not concerned with taxation of corporations owning stock in national banks, the Comptroller was without authority to use the federal statute as authority for publishing Ruling 80–0.18.

The State defends the trial court's judgment principally on three grounds: (1) that the corporate taxpayers are not "institutions" within the meaning of Article 7 of the Act of 1971 (Art. 20.02, footnote); (2) that appellants are not "affected" by revision of 12 U.S.C. Sec. 548 within the meaning of Article 7; and (3) that the substantially increased franchise tax, resulting from Ruling 80–0.18, is not an "imposition of additional taxes" within the meaning of Article 7.

The State further contends that construction of Article 7 of the Act of 1971, as urged by appellants, would lead to an "unjust result in that it would cause inequality of taxation among banks, bank holding companies and corporations generally." This contention obviously is based on the Comptroller's view that the purpose and effect of revised 12 U.S.C. Sec. 548 is to change the preexisting franchise tax structure for corporations owning stock in national banks.

In view of this contention, we deem it more orderly to consider first the purpose of revised 12 U.S.C. Sec. 548, at issue under appellants' second point of error, and thereafter consider the import of Article 7, in the Legislative Act of 1971, at issue under the first point.

■ The theory of the State, that revised 12 U.S.C. Sec. 548 authorizes the Comptroller to change the State's policy on the inclusion of dividends and interest in the stockholder's "gross receipts from its business done in Texas," is equivocal and wanting in consistency. The legislative history of revised 12 U.S.C. Sec. 548 shows that the specific purpose of the revision was ". . . to provide authorization for the States . . . to levy modern types of *taxes on national banks . . . .*" (Emphasis added) See 2 U.S.Code Cong. & Admin.News (1969), p. 1599. The Congress believed there was ". . . no longer any justification for . . . continuing to grant *national banks* immunities from State taxation which are not afforded State banks . . . ." (Emphasis added) 2 U.S. Code Cong. & Admin.News (1969), p. 1595.

In this suit the State insists that an "ancillary" and "automatic" effect of the revision was to alter the taxation of corporations owning national bank stock, but the contention is without support or a showing that such policy was of concern to the drafters of the revision or that such a change is mandated by the federal statute.

To the contrary, it appears that because Article 342–908, set out earlier, declares state and national banks equal for purposes of state taxation of the banks, revised 12 U.S.C. Sec. 548 does not abrogate the State's taxation scheme, but merely removes restrictions on state taxation of national banks, thereby enlarging taxation *permissible* for both state and national banks. As observed earlier, the specific purpose of revised 12 U.S.C. Sec. 548 was to provide authorization for the states to levy modern types of taxes on banks which were not authorized under the statute before its amendment.

Prior to revision, 12 U.S.C. Sec. 548 restricted only state taxation of national banks. The statute did not prohibit state taxation of dividends and interest flowing from stock in national banks to corporations owning such stock. The Legislature of Texas voluntarily excluded this income of corporations from "gross receipts from its business done in Texas" under the doctrine of "location of payor rule," since national banks were and are created under federal law, not state law.

It does not follow that 12 U.S.C. Sec. 548, when revised to remove restrictions on state taxation of national banks, also altered a long established procedure in Texas which had been in no manner controlled by the restrictions of the statute prior to its revi-

sion. As revised, the federal statute simply allows the states to treat national banks as state banks for purpose of equal taxation of banks. The concept thus provided is for equal taxation of banks and is unrelated to taxation of dividends and interest from national bank stock in the hands of corporate stockholders.

It is also apparent that exclusion of national bank stock dividends and interest from "gross receipts from its business done in Texas" by the taxpayers does not conflict with the stated purpose of the revised federal statute, and therefore no change is mandated by the revision. The ends of 12 U.S.C. Sec. 548 are not defeated by allowing a state to treat national banks as non-Texas corporations, for purposes of computing the stockholders' franchise tax, because there is no resulting inequality in the tax treatment of banks themselves. In fact, this procedure, of treating national banks as non-Texas corporations for purposes of the stockholders' franchise tax, has existed harmoniously in Texas for forty-five years with this State's system of equality for state and national banks. The Legislature made clear its intention in Article 342–908 (1943) *not* to "discriminate between state banks, national banks, and private banks."

This harmonious coexistence demonstrates that the principle of treating national banks as non-Texas corporations, for purposes of the stockholders' franchise tax, results in no discrimination between state and national banks and does not cause "inequality of taxation among banks," as urged by the Comptroller. The Comptroller's present position on this question is out of harmony with past performance. In the more than forty years since the Legislature declared state and national banks equal for purposes of state taxation of banks, the Comptroller has at no time challenged the exclusion of dividends and interest on national bank stock from the stockholders' "gross receipts from its business done in Texas" on the ground that the practice created an inequality between state and national banks. The Comptroller before this Court in 1972 urged the identical proposition now advanced by

the appellants and was successful in *Silco, Inc. v. Calvert*, 482 S.W.2d 56, 59 (Tex.Civ. App. Austin 1972, writ ref'd n.r.e.). In that case this Court held: "This statute (Article 342–908) requires only that state and national *banks* be treated equally under the state laws. The statute does not in any way require an equal treatment of any other corporations that are not state banks or national banks." (Emphasis added)

In the present case the trial court found that Ruling 80–0.18 was promulgated as a direct result of revised 12 U.S.C. Sec. 548. The federal statute becomes the Comptroller's only authority to support his attempt to alter the established franchise tax system, and the argument seems to be that the amended statute removed "doubt" as to "domicile" of national banks. Yet Article 342–908 made it clear that there has been no question of "domicile" simply by mandating equal treatment of state banks, private banks, and "national banks *domiciled* in this state." (Emphasis added) The question of domicile had been determined long ago without violence to compatibility of the two concepts under examination in this case. The Comptroller is committed to his own contention in *Silco, supra*, when interpreting the impact of a federal statute precisely of the same nature as Article 342–908.

The State's essential complaint appears reduced to deploring "inequality of taxation among bank holding companies and corporations generally." Since this matter of inequality presents no conflict with the revised federal statute, the Comptroller's challenge goes to the inherent inequality of the "location of payor test" itself. The Supreme Court placed that challenge beyond authority of the Comptroller in *Humble Oil & Refining Co. v. Calvert, supra*, and held there that the "location of payor test" may be changed only by action of the Legislature. (414 S.W.2d 180, col. 2)

We turn now to consideration of the Legislature's action in 1971 to forestall the levy of additional taxes on institutions affected by passage of Public Law 91–156.

■ We conclude that even if the Comptroller should be correct in the contention that the federal statute as revised had as its purpose the cure of unequal franchise tax treatment of corporations owning stock in national banks, and we have held that the statute had no such purpose, nevertheless the State may not prevail in this lawsuit. The Legislature in 1971 prohibited precisely the type of change the Comptroller undertook to make in the tax structure acting under authority claimed to be derived from 12 U.S.C. Sec. 548.

The Legislature, being aware of the revision by Congress of 12 U.S.C.A. Sec. 548, acted without delay, in fact two years before the federal statute would become operative, to anticipate changes in the State's tax system, which might be improvidently undertaken because of the federal statute, and enacted laws to prevent changes not first considered and approved by the Legislature. The legislative intent could hardly be expressed more clearly or more forcefully than in the text reading, "The passage of Public Law 91–156 (12 U.S.C.A. Sec. 548) by the Congress of the United States *shall not operate to impose or permit the imposition* of any *additional* tax or taxes upon the *institutions affected* thereby . . ." (Emphasis added)

It is the State's position that the Act of 1971 (Article 7) does not apply to bank holding companies and other corporations owning stock in national banks, and in its attempt to sustain this position the State reveals a basic flaw in the argument that the revised federal statute gives the Comptroller authority to change the established corporate franchise tax structure. The State argues that one of the purposes of the federal law was to cure unequal treatment of corporations owning stock in national banks. The State insists that such treatment is not in keeping with the spirit of 12 U.S.C.A. Sec. 548, and that an "ancillary effect" of the statute was to correct this inequality. Further, the State claims, the greatly increased franchise tax, achieved by Ruling 80–0.18, is an "automatic effect" of the federal law and therefore the federal statute is authority for the administrative Ruling.

The State continues with the argument that the corporations owning stock in national banks are *not* "institutions affected" by the federal statute within the meaning of the Act of 1971 (Article 7) because the federal amendment was adopted by Congress to cure unequal treatment of *banks* and therefore *banks* are the only "institutions affected."

Thus it is clear that the Comptroller attempted to use a federal statute as authority for increasing the franchise tax payable by these appellants by more than one million dollars annually and yet claim that the federal law does not "affect" these institutions. The finding of the trial court that Ruling 80–0.18 was promulgated as a *direct result* of revised 12 U.S.C. Sec. 548, and the further finding that the Ruling was the formal pronouncement of the Comptroller's policy, with respect to the *effect* of the federal law on the Texas franchise tax, make inescapable the conclusion that the Comptroller acted on belief that 12 U.S.C. Sec. 548 *permits the imposition* of increased taxes and that the federal law in fact "affected" appellant corporations in the ordinary dictionary sense. Appellants were *affected* when the *effect* produced was "the imposition of any additional tax or taxes" upon them, actually, in this case, at the annual rate of more than one million dollars.

It appears that the only remaining question is whether the required inclusion of dividends and interest in the stockholders' "gross receipts from its business done in Texas," resulting in substantially increased taxes, constitutes "the imposition of any additional tax or taxes" within the meaning of Article 7. We hold that inclusion of the dividends and interest, resulting in significant increases in the franchise tax of appellants, amounted to "imposition of . . . additional . . . taxes," in contravention of the prohibition the Legislature enacted in Article 7 of the Act of 1971. *Yoakum Industries, Inc. v. Calvert,* 414 S.W.2d 171 (Tex.Sup.1967); *Calvert v. Electro-Sci-*

**592**

*ence Investors, Inc.,* 509 S.W.2d 700 (Tex. Civ.App. Austin 1974, no writ).

Upon the holdings and reasoning stated, we reach the conclusion that the Comptroller acted without authority and in contravention of an explicit Act of the Legislature in promulgating and enforcing Ruling 80–0.18 to increase the franchise taxes of appellant corporations owning stock in national banks, and that the additional taxes collected ought to be refunded to the taxpayers.

The judgment of the trial court is reversed, and judgment is rendered that appellant taxpayers recover the taxes paid under protest as shown by the record in this cause.

SHANNON, J., not participating.